**Adriansen v. Marworth**

■■■■■■■■■

*Joseph P. Lenahan,* for plaintiff.
*Daniel J. Rovner,* for defendants.

MINORA, *J.,* June 18, 2007—

## INTRODUCTION

The instant issue before the court involves a petition to appeal two decisions rendered by the special trial master regarding discovery disputes. The discovery issues concern the protections from certain discoverable material that may apply to bar discovery pursuant to the Peer Review Protection Act, (PRPA), 63 P.S. §425.1 et seq. The special trial master decisions under review are dated May 3, 2006 and June 6, 2006. The parties have presented both written and oral arguments to the court rendering this matter fit for adjudication.

## STATEMENT OF THE CASE

This court rendered a previous decision on discovery for this case on July 14, 2006. We incorporate the findings of that prior opinion here, beginning with the

factual posture of the case. Allegedly, Gary Williams, now deceased, was admitted to Marworth, a licensed drug and alcohol treatment facility in Waverly, Pennsylvania, on June 26, 2000.[1] Additionally, it is asserted by the plaintiff that Marworth is affiliated with defendant, Geisinger Health Systems Inc. and defendant, Geisinger Clinic, which worked in conjunction with defendant Marworth to offer medical treatment to patients at the facility while undergoing drug and alcohol rehabilitation. Upon decedent's admittance to the facility, he was entered into the Level III program, which is the highest level of treatment available. (See plaintiff's complaint ¶15.) As declared in the complaint, the initial impression the staff received from the decedent was that he showed signs of anxiety and alcohol withdrawal upon entry. (See plaintiff's complaint ¶16.) On the day of admittance decedent was administered 90 mg of Phenobarbital to reduce his withdrawal symptoms of nausea, tremors, sweats, and anxiety at several intervals; 5:45 p.m., 8 p.m., and 10:30 p.m. (See plaintiff's complaint ¶¶18-20.)[2] The decedent received additional doses of Phenobarbital again on June 27, 2000 at four-

---

1. Marworth is licensed by the Pennsylvania Department of Health, Office of Drug and Alcohol Programs, and is accredited by the joint Commission on Accreditation of Health care Organization (JCAHO).

2. As alleged by the plaintiff, Phenobarbital is administered to help control seizures and its typical effect is to induce sleep. Yet, the drug has an adverse reaction on some individuals causing them to experience nervousness and agitation. (See plaintiff's complaint ¶21.)

hour intervals. (See plaintiff's complaint ¶23.) Reportedly, the decedent did not exhibit positive changes after each treatment according to his patient progress report. (*Id.* at ¶23.)

The following day, June 28, 2000, the deceased was administered additional doses of Phenobarbital at varying times, while he allegedly exhibited no improvement, but instead delusions, disorientation and hallucinations. (See complaint ¶¶24-30.) Due to this behavior, a counselor of the Marworth staff contacted the deceased's family to remove him from the facility which they declined. (*Id.* at ¶¶30, 31.) In the early evening hours of June 28, 2000, members of the facility contacted a nearby hospital (Community Medical Center) regarding the decedent's behavior/condition, yet there is no documentation of recommended course of treatment. (*Id.* at ¶32.) It is reported that at approximately 8:30 p.m. the decedent crawled out his window and appeared tapping on the outside of the Marworth counseling office window. (*Id.* at ¶35.) After decedent was returned to his room, another incident occurred that evening displaying signs of confusion and disorientation. (*Id.* at ¶37.) During the early morning hours of June 29, 2000, the decedent requested and was administered sleep medications. (*Id.* at ¶38.) The progress notes indicate that the decedent was asleep and in bed at 2:15 a.m. and 3:10 a.m. (*Id.* at ¶39.) At 6:10 a.m., on June 29, 2000, Sue Blackledge, a nurse's aide entered the decedent's room to record his vital signs, but he was missing; at this time Blackledge alerted the facility staff that the decedent had "eloped." (*Id.* at ¶¶40, 41.) Both

the Waverly Police and the State Police were contacted and conducted an investigation in an effort to locate the decedent.

On September 30, 2000, a group of individuals were hunting in a wooded area in Waverly, when they found the decedent's body, lying face down, in a small creek. (*Id.* at ¶49.) Later, an autopsy was performed on decedent, yet due to the "extensive postmortem decomposition" of the body, the cause of death was undeterminable. (*Id.* at ¶51.)

This cause of action was commenced by the plaintiff, Susan Adriansen, sister and administrator of the estate of Gary Williams, deceased.[3] A writ of summons was entered on May 18, 2001, which was later reinstated on July 24, 2001. The complaint was filed on November 11, 2001, thereby instituting this wrongful death and survival action including the following: one count of negligence against defendant, Marworth; a second count of vicarious liability asserted against Geisinger Clinic; and a third count, also asserting vicarious liability against Geisinger Health Systems Inc. Contained within count one asserted against defendant Marworth are allegations of negligence on the part of the medical staff, physicians and nurses in regard to the decedent's need for medical attention, his adverse reaction to

---

3. Susan D. Adriansen was duly authorized by the Register of Wills of Bergen County, New Jersey, as personal representative of the estate of Gary Williams and issued letters of administration on December 1, 2000.

medications provided, failure to prevent the elopement among a litany of other errors.

## DECISIONS OF THE SPECIAL TRIAL MASTER

The decisions of the special trial master at issue involve the proper classification of information to determine whether the information is discoverable or protected from discovery under the PRPA, discussed *supra.*

### (a) *Special Trial Master Campagna's May 3, 2006 Decision*

Special Trial Master Campagna filed two decisions on May 3, 2006 and June 6, 2006, respectively. In his May 3 decision, Special Trial Master Campagna granted defendant's motion to prevent the disclosure of the "root cause analysis of sentinel event" prepared by the defendant following the decedent's disappearance. In addition, Special Trial Master Campagna found that recorded employee interviews on computer disk were not discoverable under the PRPA.

### (b) *Special Trial Master Campagna's June 6, 2006 Decision*

In his June 6, 2006 decision, Special Trial Master Campagna granted plaintiff's motion for sanctions. Plaintiff requested that sanctions be issued against defense counsel because plaintiff's counsel had taken depositions of witnesses, unaware of the other witnesses that may have information on the events at issue.

Plaintiff's counsel argued that its deposition strategy was adversely affected without full knowledge of the witness list.

Special Trial Master Campagna granted plaintiff's motion for sanctions against defense counsel. Defense counsel was ordered to pay transcript costs for the depositions of three witnesses,[4] and counsel fees of $250 for each of these depositions.

## APPEALS FILED IN RESPONSE TO THE DECISIONS OF THE SPECIAL TRIAL MASTER

Following the special trial master's decisions, on June 14, 2006, plaintiff filed a motion for de novo appeal for both the May 3, 2006 and June 6, 2006 decisions of the special trial master, which plaintiff consolidated.[5] Plaintiff filed a supporting brief on July 18, 2006. Defendant filed a memorandum of law in response to plaintiff's motion for de novo appeal of the May 3 and June 6 decisions, consolidated, on September 5, 2006. On September 11, 2006, plaintiff filed a response to defen-

4. The witnesses were named in STM's decision: Margharetta Sakosky (deposition taken on October 13, 2004), Dana Craig (deposition taken on March 16, 2005) and Mari Walker (deposition taken on April 20, 2005).

5. Plaintiff initially filed the motion for de novo appeal to Special Trial Master Campagna's May 3, 2006 decision on May 11, 2006. Following Special Trial Master Campagna's June 6, 2006 decision, plaintiff filed a second motion for de novo appeal which plaintiff then consolidated with the first motion for de novo appeal.

dant's memorandum of law filed in response to plaintiff's motion for de novo appeal.

Concurrently, on June 16, 2006, defendant filed its own motion for de novo appeal of the June 6, 2006 decision of the special trial master. Defendant's memorandum of law in support of its motion for de novo appeal was included in its memorandum of law in response to plaintiff's motion for de novo appeal filed on September 5, 2006, and noted *supra.* Argument was held before this court on October 3, 2006. The court granted the parties 45 days from the date of argument to submit a statement of joint findings of fact. In addition, defense counsel submitted the documents and recorded interviews in dispute for this court's in camera review. The matters are now ripe for disposition.

## STANDARD OF REVIEW

We find considerable guidance in our July 14, 2006 decision in this case also involving discovery issues. As applied in our prior decision, the proper scope of our discovery, articulated in *Yadouga v. Cruciani,* 66 D.&C.4th 164, 167 (Lacka. Cty. 2004), was provided as follows:

"The purpose of the Pennsylvania 'discovery rules is to prevent surprise and unfairness and to allow a fair trial on the merits.' *Dominick v. Hanson,* 753 A.2d 824, 826 (Pa. Super. 2000). To that end, Pa.R.C.P. 4003.1 provides that 'as a general rule, discovery is liberally allowed with respect to any matter, not privileged, which is relevant to the cause being tried.' *George v.*

*Schirra,* 814 A.2d 202, 204 (Pa. Super. 2002). A discovery request is not objectionable on the grounds that it seeks 'an opinion or contention that relates to a fact or the application of law to fact' or that 'the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to discovery of admissible evidence.' Pa.R.C.P. 4003.1(b), (c). Furthermore, any limitations or restrictions upon discovery should be construed narrowly. *McAndrew v. Donegal Mutual Insurance Co.,* 56 D.&C.4th 1, 7 (Lacka. Cty. 2002); *Schwab v. Milks,* 8 D.&.C.4th 557, 558 (Lacka. Cty. 1990)."

We first note that all parties have properly brought their discovery appeal to the decision of special trial master before this court pursuant to Lacka.Co.R.C.P. 4000.1(b) which permits an order of a STM to be appealed de novo by presentation of a motion to the court to be filed within 10 days of the appealed decision and upon proof of payment to the court of appropriate costs. We find that the present appeals are properly before this court.

Having articulated the applicable standard of review, we now consider the arguments concerning Special Trial Master Campagna's decisions of May 3, 2006 and June 6, 2006. Plaintiff argues that Special Trial Master Campagna's decision finding the timeline of events surrounding decedent's disappearance and recorded interviews of employees related to the events should be reversed. Plaintiff's argument is three-fold: (1) defendant does not fit the definition of a "professional

health care provider" under the PRPA, (2) the employee interviews are recordings and are therefore not entitled to protection under the PRPA, (3) the information plaintiff seeks was prepared for the purpose of creating an incident report that does not merit peer review protection.

We consider each of these arguments in turn.

## (1) Defendant Is a "Professional Health Care Provider" Under the PRPA

In our prior decision rendered on July 14, 2006, we previously determined that defendant Marworth was included in the definition of "professional health care provider." We see no reason to disrupt our own past reasoning which acts as the law of the case.

Peer review protection is enjoyed only by those considered a "professional health care provider." 63 P.S. §425.2.[6] We are satisfied that the Marworth defendant

---

6. Section 63 P.S. §425.2 provides:

" 'Professional health care provider' means:

"(1) individuals or organizations who are approved, licensed or otherwise regulated to practice or operate in the health care field under the laws of the Commonwealth, including, but not limited to, the following individuals or organizations:

"(i) a physician;

"(ii) a dentist;

"(iii) a podiatrist;

"(iv) a chiropractor;

"(v) an optometrist;

"(vi) a psychologist;

"(vii) a pharmacist;

"(viii) a registered nurse or practical nurse;

"(ix) a physical therapist;

is provided protection under the PRPA as it is licensed by the Pennsylvania Department of Health, Office of Drug and Alcohol Programs, and is accredited by the Joint Commission on Accreditation of Health Care Organizations (JCAHO).

The PRPA functions as a self-examination tool by which professional health care providers under the act may examine, critique and possibly alter any actions or responses to situations where the institution finds through peer review that improvement is needed. The PRPA provides confidentiality protections for events and reports that demonstrate changes have been made.[7]

---

"(x) an administrator of a hospital, nursing or convalescent home or other health care facility; or

"(xi) a corporation or other organization operating a hospital, nursing or convalescent home or other health care facility; or

"(2) individuals licensed to practice veterinary medicine under the laws of this Commonwealth."

7. Section 63 P.S. §425.4 entitled "Confidentiality of review organization's records" states:

"The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinion or other actions of such committee or any members thereof: *Provided, however, that information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee, nor should any person who testifies before such committee or who is a member of such committee be prevented from testi-*

As directed by the PRPA and due to the nature of the practice of medicine and the level of skill necessary to practice medicine and related areas, medical professionals and health care facilities are in the best position to police their own activities. *Corrigan v. Methodist Hospital,* 857 F. Supp. 434 (E.D. Pa. 1994), *re'hrg denied; Dodson v. Deleo,* 872 A.2d 1237 (Pa. Super. 2005). Protection is provided under PRPA to those items of discovery subject to peer review proceedings to ensure "comprehensive, honest, and potentially critical evaluations of medical professionals by their peers." *Dodson, supra* at 1242; 63 P.S. §§425.1-425.4. Yet, there are limitations to the protections granted by the PRPA. The *Dodson* court noted that the Peer Review Protection Act (PRPA), which protects documents related to peer review from discovery or introduction into evidence in civil action against a professional health care provider, does not protect non-peer review business records, even if those records eventually are used by peer review committee. 63 P.S. §§425.1-425.4. In *Dodson* the discovery documents under scrutiny were sought in a medical malpractice action and were generated and used only by the hospital's peer review department and therefore were found to be privileged under

*fying as to matters within his knowledge, but the said witness cannot be asked about his testimony before such a committee or opinions formed by him as a result of said committee hearings."* (emphasis added)

the PRPA. The particular documents subject to the court's review included credentialing records and reports which charted problems and potential problems with the alleged negligent doctor's performance while working at the medical facility. The court concluded, after a review of the reports that the documents were created as peer review material and therefore subject to protection of the PRPA.

At 63 P.S. §425.4 entitled, "confidentiality of review organizations records" as the very first sentence the statute states, "[t]he *proceedings and records of a review committee* shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee." (emphasis added) Also at 63 P.S. §425.2, "peer review" is defined as "the procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers." A "review organization" is defined as "any committee engaging in peer review." 63 P.S. §425.2. Despite this broad definition, the confidentiality afforded peer review organizations is neither absolute nor all-encompassing. At 63 P.S. §425.4 noted *supra,* the statute goes on to say that "information, documents or records otherwise available from original sources are *not* to be construed as immune from discovery." (emphasis added)

Consistent with our prior decision of July 14, 2006, we refuse to entertain any argument that Marworth is not included in the definition of "professional health care provider" under the PRPA. Plaintiff's argument is already subject to an adverse decision in this case and is therefore dismissed by this court as our prior decision which found Marworth to be a "professional health care provider" remains the law of this case.

### (2) The Recorded Employee Interviews Are Not Peer Review Protected

Plaintiff argues that the recorded interviews of the employees who had contact with the decedent are discoverable because the PRPA does not provide for protection of information in recorded form. Special Trial Master Campagna found that the disks with recorded employee interviews "were intended to improve care rendered to patients and to educate the operators and employees of the institution in that regard." May 3, 2006 decision of the special trial master at 2.

The admissibility of employee interviews was considered in *Estate of Spangler v. Jameson Health System,* 65 D.&C.4th 129 (Lawrence Cty. 2003). In that case, the plaintiff asked the court to compel the defendant to disclose statements made by nurse employees who had contact in treating the decedent in the days before his death. The defendant hospital argued that the PRPA protected the employee nurses' statements from discovery. Plaintiff argued the nurses' statements were dis-

coverable as an "original source" and were therefore not protected under the PRPA.

The court explained the function of the PRPA. The court noted the purpose of the PRPA and exceptions to the protections provided in the PRPA in stating:

"The purpose of that provision of the PRPA is to promote heath care industry self-regulation by protecting peer review proceedings from public scrutiny. *Sanderson v. Frank S. Bryan M.D. Ltd.,* 361 Pa. Super. 491, 494, 522 A.2d 1138, 1139 (1987). The strong public policy rationale for that protection is to encourage 'free and frank discussion by review organizations' and avoid a chilling effect by preventing the imposition of civil liability based upon the testimony and documents presented to the peer review organization. *Id.* at 496, 522 A.2d at 1140. However, the Pennsylvania Legislature did not want to immunize relevant evidence simply because it was presented to a peer review organization; thus, section 425.4 of the PRPA has an exception for 'information, documents or records otherwise available from other sources.' 63 P.S. §425.4. *The second exception provides that individuals who testified to or were members of a peer review committee can be required to testify in a civil action about matters of which they have personal knowledge, but not about the proceedings or findings of the committee. Id."* Estate of Spangler v. Jameson Health System, 65 D.&C.4th at 132. (emphasis added)

Having reviewed numerous written documents and recorded compact disks recordings in camera, we find

it undisputed that employee interviews were conducted for the purpose of completing the root cause analysis of the sentinel event. Obviously facts need to be gathered before a report may be generated. It is clear the employees who had provided the interviews have their own information as original sources. Of course, any subsequent report generated as a result of this work or alteration in procedures implemented as a result of the investigation of the mistakes made would also merit protection under the PRPA. See 63 P.S. §425.4, *supra* at note 7. Statements of witnesses having first-hand encounters with the decedent are distinguishable because they are the basis on which such remedies may be made. These statements are the exact type of information that is considered an original source, which is not protected under the PRPA. Accordingly, plaintiff may choose to depose those individuals noted in footnote four and any other similarly situated witnesses. They can also be compelled to testify regarding their own original source knowledge. They cannot, however, be required to testify for discovery purposes or in a civil action about their appearance, their peer review proceedings not original source, or about the findings of the committee. *Spangler, supra* at 132.

Of course, how the peer review committee analyzes this information and the changes made in response to this information is likewise protected under the PRPA. It is not the facts that the peer review committee work with that are protected, rather it is what the peer review

committee *does* with these facts that is protected. These subsequent committee changes or actions either in the form of changes to procedure, new regulations, new responses of employees, standard operating procedures and the like are also PRPA protected. Therefore we sustain the finding of Special Trial Master Campagna and hold the recorded employee interviews are protected by the PRPA as "the proceedings and records of a review committee," and are therefore protected and not subject to discovery. Having concluded, however, as noted above, plaintiff can still conduct their own interviews for discovery of these individuals as original sources.

### (3) The Root Cause Analysis Report Is Not an Incident Report; PRPA Protects the Root Cause Analysis Report From Discovery

We find considerable guidance in the decision of Special Trial Master Campagna on this issue. Special Trial Master Campagna found that the timeline of events qualified for peer review because "[d]iscussed in the documents are the various factors in play and their causes and effects as elements in the total scenario together with possible methods of risk reduction." May 3, 2006 decision of STM Campagna at 2.

From our own in camera review of the "Root cause analysis of sentinel event" submitted by the defendant, we find that this document was indeed prepared for the purpose of peer review and is therefore deserving of protection under the PRPA. While the document does include a timeline, more importantly, it also discusses various "Risk reduction strategies."

While we find Special Trial Master Campagna's reasoning sound, his ruling does not completely bar plaintiff from discovering two categories of information: (1) incident reports, and (2) information that is discoverable from its original source. In *Dodson v. Deleo,* cited *supra,* 872 A.2d at 1244, the court distinguished between information rendered peer review protected and information that is not:

"That some of the information contained within these documents may be available from other sources does not alter the result. Clearly, a hospital cannot create protection for a document simply by sending it to the peer review committee. *Atkins* [*v. Pottstown Memorial Med. Center,* 430 Pa. Super. 279, 634 A.2d 258 (1993)]. On the other hand, documents generated by a peer review committee specifically for use in the peer review process are not discoverable simply because some of the information contained therein is available elsewhere. *Young* [*v. The Western Pennsylvania Hospital,* 722 A.2d 153 (Pa. Super. 1998)]. To hold otherwise would have a chilling effect on the peer review process and would clearly run afoul of the purpose of the statute."

The *Dodson* court provided alternative classifications that would render information either peer review protected or exempt from peer review protection depending on the nature of the information. We therefore determine the written report sought by the plaintiff is peer review protected under the PRPA as determined by

Special Trial Master Campagna. The report is therefore not discoverable and Special Trial Master Campagna's decision should not be disturbed.

## (4) Sanctions

Plaintiff and defendant filed cross-appeals to Special Trial Master Campagna's determination that sanctions were appropriate against defense counsel for counsel's failure to disclose a complete list of possible witnesses prior to plaintiff's counsel taking witness depositions. As stated *supra,* counsel for defendant was ordered to pay the transcript costs, plus attorney's fees in the amount $250 for each of three depositions.

Plaintiff argues the sanctions against defense counsel are inadequate to meet the cost incurred by the plaintiff in taking the prior witness depositions that need to be re-taken. Conversely, defendant argues that no sanctions should be imposed because they continuously informed plaintiff's counsel of the ongoing peer review investigation.

Our consideration of whether sanctions are appropriate against defendant depends not only upon our decisions regarding the admissibility of both the recorded interviews and the "Root cause analysis of sentinel event" written report prepared by defendant. Our finding that employee depositions are still available to the plaintiff as original source material also leads to the conclusion that counsel for the plaintiff may need to retake depositions in light of this new

information. "The imposition of such sanctions [pursuant to Pa.R.C.P. 4019(c)(2)] is vested in the sound discretion of the trial court . . . ." *Schweikert v. St. Luke's Hospital of Bethlehem,* 886 A.2d 265, 268 (Pa. Super. 2005).

We therefore determine that Special Trial Master Campagna's decision imposing sanctions on defense counsel was proper, however no record exists for us to be able to determine the reasonableness of counsel fees awarded to the plaintiff as a sanction. Accordingly, we sustain Special Trial Master Campagna's decision to award sanctions however the appropriate amount, either more or less, needs to be determined after a proper record and time itemization is made.

An appropriate order follows.

## ORDER

And now, on June 18, 2007:

(1) The May 3, 2006 decision of Special Trial Master Campagna is affirmed; the seven disks containing recorded employee interviews are found to be protected under the PRPA, 63 P.S. §425.4; the "Root cause analysis of sentinel event" written report is also found to be protected under the PRPA, 63 P.S. §425.4.

(2) The June 6, 2006 decision of Special Trial Master Campagna awarding sanctions to the plaintiff is affirmed in an amount to be determined later.